IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

KAREN J. MYERS,                          )
                                         )
                Plaintiff,               )
                                         )
                                         )
v.                                       )        No. 3:05-CV-511
                                         )
UNITED STATES CELLULAR                   )
CORPORATION,                             )
                                         )
                Defendant.               )

## <u>MEMORANDUM OPINION</u>

This civil action is before the court for consideration of "Defendant's Motion for Summary Judgment" [doc. 42]. Plaintiff has filed a response [doc. 66]. Defendant has submitted a reply [doc. 67], and the motion is ripe for the court's consideration and determination. The court heard oral argument on October 23, 2006.

Plaintiff has brought suit pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et. seq.*, for alleged sex discrimination resulting from her termination.[1] Plaintiff also contends that she was discriminated against based upon her sex because she was terminated rather than being given a demotion. For the reasons stated herein, the motion will be granted, and this case will be dismissed.

---

[1] By a stipulation of dismissal filed January 17, 2006, plaintiff dismissed with prejudice her claim brought pursuant to 42 U.S.C. § 1981 [doc. 11].

*Background*

Plaintiff began working for defendant in 1994 as a Data Service Engineer. She held several positions and received positive performance evaluations, including a "FE" or "Far Exceeds" given by Employee No. 1.[2] for her 2002 performance. Employee No. 1, a male, gave only one other associate an "FE" rating. In May 2003, plaintiff was promoted to Supervisor 1x Data Enhanced Services by Kent Lee and his manager Employee No. 1. In July 2003, Employee No. 1 asked plaintiff to assume the position of Manager of Data Services on an interim basis while the present male manager was on leave. Plaintiff was chosen to do this over another supervisor who was a male. Employee No. 1 officially promoted plaintiff to the Manager of Data Services position in December 2003. Plaintiff then began reporting to Lee who in turn reported to Employee No. 1. Lee left defendant's employ, and plaintiff reported to Employee No. 1 until William Heilenbach became the Director of Network Operations Center in November 2004. Heilenbach reported to Mike Irizarry, the Executive Vice President of Engineering and Chief Technical Officer. In September 2004, Employee No. 1 made the decision to restructure his team including the

---

[2] The identities of certain employees as well as personnel information concerning those employees are under seal. In her response to the pending motion, plaintiff designated these employees by numbers, and the defendant adopted those designations in its reply brief. The court will employ the same designations.

Data Services Department.

In September 2004, Employee No. 1 met with plaintiff to address certain issues concerning her job performance. He told her she needed to confront those who were undermining her, in particular Employee No. 2, a male associate who reported directly to her. Plaintiff has admitted that she and Employee No. 2 did not get along. The record reflects that they argued and complained about each other on a regular basis, with Employee No. 1 referring to their conduct as "sniping" at each other. Nevertheless, plaintiff led Employee No. 2 to believe that he was performing satisfactorily and then told her supervisors that his performance was very inadequate. At the meeting, Employee No. 1 introduced plaintiff to Roberta Frank-Bohm, the Senior Associate Relations Manager, to help plaintiff with the areas in which she was lacking.

The same day Employee No. 1 also met with Employee No. 2 separately and jointly with plaintiff. At the joint meeting, Employee No. 1 spoke to them about team work and supporting each other. Employee No. 1 also told plaintiff that she needed to evaluate her team to determine whether each person was a good fit for the position held by that person in view of the upcoming reorganization. Both plaintiff and Employee No. 2 were also told that they were being placed on a Performance Improvement Plan ("PIP"). Plaintiff testified that after leaving the joint meeting she had no doubt that Employee No. 1 was not happy with her work performance and that there was no doubt he was also unhappy with the work performance of Employee No. 2. Plaintiff also testified that after the meetings Employee No.

1 saw she was upset and met with her privately and told her he would support her to get where she needed to be and that he wanted her to be successful.

After receiving the PIP, both plaintiff and Employee No. 2 asked Employee No. 1 for a lesser position. Employee No. 1 agreed but emphasized that they would have to work together as a team until completion of the reorganization. However, Employee No. 1 testified that their conduct towards each other did not change, and he decided to terminate both of them.

Plaintiff's PIP indicated deficiencies in her performance in the areas of "Coaching, Communication, Team Effectiveness, Business Process Improvement, and Leadership." These deficiencies were related to her issues concerning Employee No. 2. Both Employee No. 1 and plaintiff's supervisor Heilenbach testified that it was plaintiff who should have put Employee No. 2 on a PIP as he reported to her. Both also independently told her that she had the responsibility to initiate termination procedures against Employee No. 2 if she believed he was undermining her.

Also in September 2004, plaintiff attended a management meeting in Galena, Illinois at which Employee No. 1 referred to Irizarry as a "crazy" or "bad grandmother" and the "white elephant in the room." Irizarry testified that he learned about the remarks made by Employee No. 1 for the first time from plaintiff. He was in Knoxville, and plaintiff offered to give him a ride to the airport. During that ride, plaintiff indicated to Irizarry that an unfavorable comment had been made about him at the Galena meeting by Employee No.

1and she thought he should know about it. She also told him that he could talk to Tom Lovett and Rick Rockershousen about the comment as they were also present and could tell him what was said. Irizarry did speak with both Lovett and Rockershousen, though Rockershousen had already left the company.

Irizarry further testified about a conversation he had with Employee No. 1 shortly after the holidays in early 2005. Irizarry stated that he spoke to Employee No. 1 individually at a country club where they were attending a staff meeting and told Employee No. 1 that he had received feedback that Employee No. 1 had made comments about him that were not positive or constructive. Irizarry stated that Employee No. 1 appeared uncomfortable, which led him to believe that Employee No. 1 knew what he was talking about. Employee No. 1 denied in his deposition that the meeting occurred and denied that Irizarry coached him about any negative comments. In an affidavit, Employee No. 1 stated that Irizarry did not tell him about his conversation with plaintiff or about the comment. Employee No. 1 also stated in the affidavit that he did not know Irizarry spoke with Lovett about the comment in the Galena meeting and he did not have a discussion with Lovett about the comment.

Heilenbach testified that Myers complained to him about Employee No. 2 and her superiors, including Employee No. 1. Plaintiff admitted in deposition testimony that she complained about Employee No. 1 to more than one person. In December 2004 and January 2005, Heilenbach held meetings with plaintiff to address the changes she needed to make to

improve the operation of her team.

In mid January 2005, Employee No. 1 told Heilenbach that he intended to terminate plaintiff and Employee No. 2 for their continued sniping at each other, and on January 31, 2005, Employee No. 1 terminated both plaintiff and Employee No. 2. At plaintiff's termination, Employee No. 1 told her that he had received feedback about her badmouthing leadership and the decision to terminate her was his alone. He also told her that "trust is a very important thing and unfortunately the trust has been broken."

## II.

*Summary Judgment Standard*

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Canderm Pharmacal, Ltd. v. Elder Pharms., Inc.*, 862 F.2d 597, 601 (6th Cir. 1988) (quoting Fed. R. Civ. P. 56(c)). The moving party may discharge its burden by demonstrating that the non-moving party has failed to establish an essential element of that party's case for which he or she bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party need not support its motion with affidavits or other materials negating the opponent's claim. *Id.* at 323. Although the moving party has the initial burden,

that burden may be discharged by a "showing" to the district court that there is an absence of evidence in support of the non-moving party's case. *Id.* at 325 (emphasis in original).

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

III.

*Analysis*

Title VII makes it illegal for an employer to "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's

race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiff's Title VII claim is based on sex discrimination. To withstand a motion for summary judgment in a Title VII case, the plaintiff must present direct evidence of discrimination or present circumstantial evidence through a prima facie case. *See Mitchell*, 964 F.2d at 582. There is no direct evidence of discrimination in this case; thus, plaintiff must make a prima facie showing using the well-known and established *McDonnell Douglas/Burdine* burden-shifting framework. To establish a prima facie case of discrimination under Title VII, plaintiff must show that: 1) she is a member of a protected class; 2) she suffered an adverse employment action; 3) she was qualified for the job; and 4) she was replaced by a person outside the protected class or treated differently from similarly situated members of the unprotected class. *Hoskins v. Oakland County Sheriff's Dep't,* 227 F.3d 719, 731 (6th Cir. 2000); *see also Ang v. Proctor & Gamble Co.*, 932 F.2d 540, 548 (6th Cir. 1991).

Once plaintiff establishes a prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The defendant does not need to prove the nondiscriminatory reason but needs to "merely articulate a valid rationale." *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 514 (1993)). If the defendant meets this burden of production, the burden shifts to the plaintiff to produce evidence from which a jury could find that the proffered reason is a pretext for unlawful discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S.

248, 256 (1981).

Prima Facie Case - Termination

Defendant first challenges plaintiff's prima facie case at the third prong, arguing that plaintiff was not qualified for the management job she held at the time she was fired. Defendant argues that plaintiff was not meeting her employer's legitimate performance expectations in the management position and was therefore unqualified. The plaintiff relies on the Sixth Circuit's decisions in *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651 (6th Cir. 2000), and *Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579 (6th Cir. 2002), and argues that defendant's evidence that she was unqualified is being improperly used at the prima facie stage. "When assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Cline*, 206 F.3d at 660-61.

In *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003), the Sixth Circuit set out the requirements a plaintiff must meet to satisfy the qualification prong of the prima facie test. The court stated:

> At the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job. The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for

9

employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.

*Id.* at 575-76 (emphasis in original and internal citations omitted). Based on this analysis, the court believes that plaintiff was qualified for the job. Plaintiff's excellent performance history and prior experience demonstrate that she had sufficient objective criteria to consider her qualified for the management position. Therefore, plaintiff has met the qualification prong of the prima facie case.

Defendant, however, also challenges plaintiff's prima facie case at the fourth prong, contending that plaintiff was not replaced by a male and/or she was not treated differently than similarly situated males. The court will first look at whether plaintiff was replaced by someone in the unprotected class.

The Sixth Circuit has stated that a "person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990) (other citations omitted)). "Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement." *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir.

1992).

Andrew Spence testified that plaintiff's job responsibilities were split among three employees, Mark Siolkowski, Alex Messing, and himself. Eventually, defendant hired Kurt Johnson to assume plaintiff's responsibilities; however, there is no indication in the record when he was hired. Thus, the court cannot assess the proximity of his hiring to plaintiff's termination. In any event, while Johnson took over plaintiff's responsibilities, he was hired for a new senior management position that was different from the position plaintiff held and that had requirements plaintiff has admitted she could not meet. The court concludes that plaintiff was not "replaced" as that term is used by the Sixth Circuit in the employment context. Therefore, the court next looks to whether plaintiff was treated differently from similarly situated males in order to determine if plaintiff can establish her prima facie case based on disparate treatment.

"Disparate treatment occurs when an employer treats some employees less favorably than others because of race, religion, sex, or the like." *Huguley v. Gen. Motors Corp.*, 52 F.3d 1364, 1370 (6th Cir. 1995). "To prevail on a claim of disparate treatment a plaintiff must show that her employer intentionally discriminated against her." *Lynch v. Freeman*, 817 F.2d 380, 382 (6th Cir. 1987); *see also Lovas v. Huntington Nat'l Bank*, No. 99-3213, 2000 WL 712355, at *5 (6th Cir. May 22, 2000). Intent can be shown by direct evidence or inferred from a prima facie showing of discrimination. *Huguley*, 52 F.3d at 1370; *see also Shah v. Gen. Elec. Co.*, 816 F.2d 264, 267 (6th Cir. 1987) (proof of

discriminatory motive can be inferred from differences in treatment). "In order to succeed in a Title VII discrimination action, 'a plaintiff is required to demonstrate that the adverse employment decision would not have been made "but for" her sex.'" *Simon v. City of Youngstown*, 73 F.3d 68, 70 (6th Cir. 1995) (quoting *Gutzwiller v. Fenick*, 860 F.2d 1317, 1325 (6th Cir. 1988)). Thus, to ultimately prevail in this Title VII discrimination case, plaintiff must show that defendant would not have terminated her except for her sex.

In order to demonstrate that she was "similarly situated" to the employees she claims were treated differently or more favorably, plaintiff must prove that all relevant aspects of her employment situation were "nearly identical" to those of the other employees. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994). With regard to being "similarly situated," the Sixth Circuit has stated:

> Thus, to be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employers' treatment of them for it.

*Mitchell*, 964 F.2d at 583 (citations omitted). More recently, the Sixth Circuit explained "similarly situated" in *Clayton v. Meijer, Inc.*, 281 F.3d 605 (6th Cir. 2002):

> As this Court first explained in *Mitchell*, "[i]t is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly situated *in all respects.*" 964 F.2d at 583 (emphasis in original). As further explained in *Ercegovich* [*v. Goodyear Tire & Rubber Co.*, 154

12

F.3d 344 (6th Cir. 1998)], "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly situated'; rather . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'" 154 F.3d at 352 (emphasis in original) (citation omitted). Finally, in *Perry* [*v. McGinnis*, 209 F.3d 597 (6th Cir. 2000)] we explained that "this Court has asserted that in applying the standard [that plaintiff must show that he is treated differently than similarly situated employees from outside the class] courts should not demand exact correlation, but should instead seek relevant similarity." 209 F.3d at 601.

*Id.* 610-611.

Plaintiff compares herself to Lovett and Employee No. 1 because she contends both were men who badmouthed leadership but were not fired. Plaintiff paints with too broad a brush. She must show these two males are similarly situated to her, not just that they are males. In the court's opinion, neither of these people is comparable to plaintiff.

Employee No. 1 was a vice president while plaintiff was a manager, which according to the record was two levels above plaintiff in position. Their job responsibilities were obviously very different, and they were each responsible to different supervisors. Significantly, Employee No. 1 had the authority to discipline and terminate plaintiff, a strong factor indicating that these two people were not similarly situated. In addition, there is no showing that Employee No. 1 had the same performance problems or issues that plaintiff had with Employee No. 2 or that Employee No. 1 had been placed on a PIP for the same performance and leadership issues that were identified in plaintiff's PIP. There just are no

13

relevant similarities between plaintiff and Employee No. 1 to find they were similarly situated.

Plaintiff's attempt to compare herself with Lovett also falls short. When Irizarry questioned Lovett about the comment made by Employee No. 1, Lovett had assumed the position of Regional Switch Manager. Lovett no longer reported to Employee No. 1 or to Irizarry. In addition, plaintiff has not shown whether her position was relevantly similar to Lovett's position. While plaintiff initiated the conversation with Irizarry to inform him about Employee No. 1's comment, Lovett was approached by Irizarry about it. Thus, Lovett did not initiate passing the information on to Irizarry. There is also no evidence that Lovett had the same performance issues as plaintiff or that he was on a PIP for such performance issues. For these reasons, the court concludes that plaintiff was not similarly situated to Lovett. Because plaintiff has not demonstrated that she was similarly situated to male employees who were treated differently than her, she has failed to establish the fourth prong of her prima facie case for discriminatory termination.

### Prima Facie Case - Denial of Transfer

Plaintiff also contends that she should have been allowed to accept a demotion by transferring to a lower position. To establish a prima facie case under a denial of transfer theory, a plaintiff must show that

> 1) he or she is a member of a protected class; 2) at the time of his or her termination he or she was qualified for other available

positions within the corporation; 3) the employer did not offer such positions to the plaintiff; and 4) a similarly-situated employee who is not a member of the protected class was offered the opportunity to transfer to an available position, or other direct, indirect, or circumstantial evidence supporting an inference of discrimination.

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 351 (6th Cir. 1998).

Plaintiff has presented no evidence of an available position for which she was qualified at the time of her termination. While plaintiff contends that a position existed because she was supposed to be part of the reorganization, she has not identified what specific position was available but denied to her. In addition, plaintiff has not shown that similarly situated male employees were given the opportunity to transfer to an available position while she was not. Although plaintiff has named several employees who were allowed to transfer to lesser positions, there is no showing that these male employees were similarly situated to her in all relevant aspects or that they were given the opportunity to transfer in lieu of termination. There is no evidence that these employees had comparable positions to plaintiff, that they had the same performance issues, that they were subject to a PIP, or that they were known to have "badmouthed" or criticized company leaders. Further, Employee No. 1 testified that he had terminated for performance issues three other male employees besides Employee No. 2 without offering a demotion as an alternative. The court therefore concludes that plaintiff has not stated a prima facie case for sex discrimination based on a failure to transfer theory.

Having not made the requisite prima facie showing on her claims, plaintiff's Title VII case fails on that basis alone. Nevertheless, even if it is assumed for the purpose of argument that plaintiff has demonstrated a prima facie case under both theories, defendant has articulated legitimate, non-discriminatory reasons for terminating her. The burden then shifts to plaintiff to demonstrate that the reasons given are a pretext for discrimination, and the court will consider whether plaintiff can show pretext.

Pretext

In order to demonstrate pretext, plaintiff must do more than just impugn the legitimacy of the employer's asserted justification; "the plaintiff 'must produce sufficient evidence from which the jury may reasonably reject the employer's explanation.'" *Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 730 (6th Cir. 1999) (quoting *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1083 (6th Cir. 1994)); *see also Pierce*, 40 F.3d at 804 (plaintiff must do more than impugn employer's asserted justification; "plaintiff must also adduce evidence of the employer's discriminatory animus."). With regard to pretext, the Sixth Circuit has stated:

> To raise a genuine issue of material fact on the validity of an employer's explanation for an adverse job action, the plaintiff must show, again by a preponderance of the evidence, either (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action.

*Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996)(citations omitted); *see also Manzer*, 29 F.3d at1084. "To prove pretext, the plaintiff must introduce admissible evidence to show 'that the proffered reason was not the true reason for the employment decision' and that [discriminatory] animus was the true motivation driving the employer's determination." *Barnes v. United Parcel Serv.*, 366 F. Supp. 2d 612, 616 (W.D. Tenn. 2005) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508 (1993)). At all times, the ultimate burden of persuasion remains with the plaintiff. *Burdine*, 450 U.S. at 253.

At her termination, Employee No. 1 told plaintiff that he had feedback that she had been badmouthing leadership, including himself, and that the trust had been broken between them. Defendant stated the following in its position statement before the Tennessee Human Rights Commission:

> [B]oth Ms. Myers and [Employee No. 2] continued to demean and criticize one another behind their backs. [Employee No. 1] also discovered that Ms. Myers still was not fulfilling her leadership duties and that she also was "bad mouthing" and undermining management, and especially [Employee No. 1] himself.

In its brief in support of summary judgment, defendant continues to present the same explanation:

> Unfortunately, both Myers and [Employee No. 2] continued to demean and criticize one another. [Employee No. 1] discovered that Myers still was not fulfilling her leadership duties and that she also was "bad mouthing" and undermining management, including [Employee No. 1] himself.

Plaintiff admits that she badmouthed Employee No. 1, that she told Irizarry

about Employee No. 1's derogatory comments about him, and that she and Employee No. 2 did not get along. Badmouthing leadership, being disloyal to a supervisor and/or employer, failing to properly deal with a subordinate employee, and breaking the trust of a supervisor are reasons sufficient to motivate plaintiff's termination. This is especially true in light of the fact that plaintiff held a managerial position in which she had the responsibility to lead and direct by example a number of employees. However, plaintiff can still demonstrate pretext by showing that the proffered reasons did not actually motivate the adverse employment action.

Plaintiff contends that defendant's reasons for terminating her have shifted over time. She argues that the evidence does not support defendant's present claims that plaintiff badmouthed leadership in general, that everybody had problems working with her, and that others complained about her. Even if untrue, these facts do not cast doubt on the motivation for the reasons given for plaintiff's termination nor would they lead a jury to reject defendant's explanation. These contentions are not materially inconsistent with defendant's proffered reasons and are not sufficient to raise a doubt about defendant's motivation for firing plaintiff. Any issue of fact concerning these matters would be collateral, not material.

Plaintiff also argues that defendant has changed its justification for her termination because Employee No. 1 told Irizarry that plaintiff's termination was performance related. Plaintiff relies on *Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d

579, 592 (6th Cir. 2002) for the proposition that "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext." In *Cicero*, the plaintiff attempted to show that the reason for his termination was false. After litigation had begun, Borg-Warner for the first time stated in answers to interrogatories that the plaintiff was fired for poor performance. A different reason was given in a deposition. The Sixth Circuit noted that "[d]uring this Court's consideration of the summary judgment motion, Borg-Warner again shifted its position." *Id*. The Sixth Circuit went on to state, "When the justification for an adverse employment action changes during litigation, that inconsistency raises an issue whether the proffered reason truly motivated the defendant's decision." *Id*.

That is not what has happened in this case. Defendant's position has not changed during the litigation. Whether Employee No. 1 told Irizarry that plaintiff's termination was for nonperformance does not place the truthfulness of the reasons articulated by defendant in doubt. Plaintiff has admitted that she criticized Employee No.1 and that she told Irizarry about the derogatory comment. Her conduct was sufficient to warrant dismissal. Whether or not Employee No. 1 told Irizarry the termination was related to performance does not show or infer that sex discrimination was the real motive. Certainly, there is ample documentation in the record from plaintiff's PIP to justify dismissal for performance related issues. Stating that plaintiff's termination was performance related does not amount to shifting justifications as described in *Cicero*. It is at most a collateral reason for the termination, but it does not diminish the sufficiency of the reasons given for defendant's

employment action. Additionally, defendant has not changed its position that plaintiff was fired for badmouthing leadership, breaking the trust with her supervisor, and for her conduct with Employee No. 2; it has continued to maintain that these are reasons for terminating plaintiff. Defendant has not materially shifted its justification.

In addition, plaintiff also attempts to cast doubt on the defendant's motivation for its employment action by contending that Employee No. 1 denied that Irizarry coached him about badmouthing. Again, it is immaterial whether Irizarry did or did not coach Employee No. 1. Employee No. 1 knew that plaintiff had badmouthed leadership and broken the trust between them. Whether that information came from Irizarry or elsewhere does not cast doubt on the defendant's explanation or infer sex discrimination.

Yet perhaps most significant is plaintiff's admission that she was terminated for badmouthing leadership because she told Irizarry about Employee No. 1's comment at the Galena meeting. In her response brief plaintiff states, "First, the evidence shows that Ms. Myers was terminated for 'badmouthing' [Employee No. 1], and not for performance-related issues." She further states in the same brief, "It is clear that Ms. Myers termination resulted from [Employee No. 1's] discovery that she had told Irizarry of [Employee No. 1's] badmouthing him. . . . The proximity of time between this discovery [badmouthing] and Ms. Myers' termination infers that this is truly the reason for the termination, not performance issues or [Employee No. 2]. "

However, plaintiff's contention that the real reason for her termination was not performance issues but rather because she told Irizarry about the "grandmother" comment does not advance her case nor does it create a material issue of fact. Assuming that plaintiff's contention is true, firing her because she told Irizarry about the derogatory comment is not in and of itself sex discrimination. Nor does that action infer a discriminatory motive on the part of Employee No. 1. Plaintiff has simply failed to present evidence to show that the real reason for her termination was sex discrimination. She has thus failed to demonstrate pretext.

<u>Interim Pay, Vacation Time, and Training</u>

In the complaint, plaintiff raises allegations of discrimination based on interim pay, vacation time, and training. After defendant challenged these allegations in its motion for summary judgment, plaintiff in her response conceded that she was not making separate actionable claims based on these allegations. Instead she contends that this conduct is relevant background evidence to support her claims of discrimination.

The allegations concerning interim pay and vacation time involved a different supervisor, Kent Lee, and are not relevant to the actions taken by Employee No. 1. With regard to the training issue, plaintiff contends that Andrew Spence was given a path for training sessions and a mentor when he was elevated to a supervisor position. Spence testified that he received the development plan in March 2005 and seemed to indicate it was

for new managers after the reorganization.  There is no showing in the record how similarly

situated plaintiff and Spence may or may not have been, for example, whether they both had

prior supervisory experience and similar job responsibilities.   In an affidavit, Employee No.

1 stated:

> In fall of 2004, I helped put together a career plan for a new
> supervisor, Andrew Spence, to provide him with a mentor and
> a plan to help him succeed as a leader at USCC.  Unlike Ms.
> Myers, Mr. Spence never had been in a supervisory role before
> this time.  Also, by fall of 2004, in light of the leadership
> problems exhibited by Ms. Myers and [Employee No. 2], it was
> clear that USCC needed to help newly promoted leaders to be
> successful.

While implementation of a development plan might demonstrate that defendant did not

sufficiently train employees in and for leadership positions, it does not set a background of

sex discrimination nor raise a material issue of fact concerning the reasons for plaintiff's

termination.

## Same Actor Inference

Additionally, the court believes that application of the same actor inference is

appropriate in this case.  This rule states that "where the hirer and the firer are the same

individual and the termination of employment occurs within a relatively short time span

following the hiring, a strong inference exists that discrimination was not a determining

factor for the adverse action taken by the employer." *Buhrmaster v. Overnite Transp. Co.*,

61 F.3d 461, 463 (6th Cir. 1995). The inference has been applied in the promotion context as well. *Hartsel v. Keys*, 87 F.3d 795, 804 n.9 (6th Cir. 1996) ("This rationale [for the same actor inference] seems applicable to Keys's decision to promote Hartsel temporarily but later find her lacking for the permanent position. It '. . . hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job.'" (quoting *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991)). The inference is not mandatory and may be vitiated by other evidence. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573 (6th Cir. 2003). When the same actor inference is drawn, "it is insufficient to warrant summary judgment for the defendant if the employee has otherwise raised a genuine issue of material fact." *Id.* at 573-74. In addition, the strength of the inference is qualified "according to the period of time between the hiring and firing or promotion and firing of an employee by the same person." *Phelps v. Jones Plastic & Eng'g Corp.*, 20 F. App'x 352, 358 (6th Cir. 2001) (citing *Buhrmaster*, 61 F.3d at 464).

In July 2003, Employee No. 1 selected plaintiff to serve as interim Manager of Data Services while the male manager was on leave, and he made the selection over another supervisor who was a male. Employee No. 1 then promoted plaintiff to the position of Manager of Data Services in December 2003. Not long before plaintiff assumed the interim management position, Employee No. 1 had given her the highest possible rating of "FE" or "Far Exceeds" on her 2002 annual performance evaluation. Only one other associate received an "FE" from Employee No. 1. The decision to terminate plaintiff was made solely

by Employee No. 1. In addition, even after placing plaintiff on the PIP, Employee No. 1 told her that he would support her and help her to get where she needed to be and that he wanted her to succeed.

In the court's opinion, the same actor inference is very strong in this case, and absent the finding of a material issue of fact, should warrant summary judgment. In a span of approximately 18 months, Employee No. 1 promoted plaintiff twice, the first time over a male supervisor for the interim management position held by a male. The record reflects that once plaintiff was promoted to the management position, Employee No. 1 told her that he wanted her to be successful in the job. Even after plaintiff was placed on the PIP, Employee No. 1 told plaintiff he would help her get to where she needed to be and that he wanted her to succeed. Toward that end, he had plaintiff meet with company personnel who could assist her in developing the needed skills.

It borders on incredible that Employee No. 1 would have high praise for plaintiff's abilities and performance record, promote her based on those abilities and record, encourage her to succeed, and then fire her because she is a woman. "An individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class." *Buhrmaster*, 61 F.3d at 464. In this case, it is very highly unlikely that Employee No. 1 would have advanced, supported, and elevated plaintiff as he did and then decide to terminate her because she is a woman.

## At-Will Employment

It must also be noted that Tennessee adheres to the "employment-at-will doctrine, which provides for employers or employees to terminate their relationship without breach of contract given 'good cause, bad cause, or no cause.'" *Yates v. Hertz Corp.*, 285 F. Supp. 2d 1104, 1111 (M.D. Tenn. 2003) (citations omitted); *see also Bonastia v. Berman Bros., Inc.*, 914 F. Supp. 1533, 1537 (W.D. Tenn. 1995). An employer just cannot terminate an employee for a discriminatory reason.

> Title VII does not diminish lawful traditional prerogatives of an employer in making business decisions so long as the employer's reasons are not discriminatory in violation of Title VII. It is axiomatic that under Title VII, this Court does not sit as a "super-personnel" board of review to second guess or re-examine an employer's nondiscriminatory business decisions.

*Seay v. Tenn. Valley Auth.*, 340 F. Supp. 2d 832, 842 (E.D. Tenn. 2004) (citations omitted).

Plaintiff understandably feels that she was not treated fairly by Employee No. 1 or the defendant.[3] The record most certainly reflects that during her years of employment plaintiff worked long hours and showed great dedication to her job. She received promotions and accolades for her hard work. After being placed on the PIP and learning of the forthcoming reorganization, she thought Employee No. 1 would allow her to step down from the management position, and he had indicated he would do so. However, Employee No. 1 learned that plaintiff had badmouthed management, including making comments about him.

---

[3] Deposition testimony reveals that later in 2004 Employee No. 1 was given the option of resigning or being terminated. He chose to resign.

In all likelihood, Employee No. 1 saw that as an act of disloyalty. Indeed, there is testimony in the record that Employee No. 1 had told his subordinates that he expected loyalty and that he would terminate immediately anyone who was disloyal.

In addition, Lovett testified that Employee No. 1 called him and said he was aware that Lovett had badmouthed him. Lovett stated that Employee No. 1 was very angry and stern, but he would not give any specific information about what was said to allow Lovett to explain. Lovett also testified that he believed Employee No. 1 would have fired him over the incident if he had not already changed positions and was no longer accountable to Employee No. 1. This fact and the fact that Employee No. 2, a male, was terminated along with plaintiff, stand in contrast to plaintiff's contention that she was terminated because she is a woman.

While the action taken by Employee No. 1 to terminate plaintiff may not appear just or fair, especially in light of plaintiff's many years of dedication and hard work, it is not in and of itself sex discrimination. Absent a showing of discriminatory intent, Employee No. 1 was free to terminate plaintiff as he did, whether or not his action was just or fair or based on a good reason. Loyalty was obviously important to Employee No. 1 as was the ability to trust his employees; hence, he told plaintiff at her termination that "the trust has been broken." This is sufficient justification for terminating plaintiff under the facts of this case.

Plaintiff has not proffered any evidence that sex discrimination was the real reason for her termination. Accordingly, summary judgment is proper on her Title VII claim. An order consistent with this opinion will be entered.


ENTER:


_____
s/ Leon Jordan
United States District Judge